CLERKS OFFICE US DISTRICT COURT
AT ROANOKE, VA
FILED

**February 05, 2025**

LAURA A. AUSTIN, CLERK
BY: **/s/ S. Wray**
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Criminal Action No. 7:24-cr-00008 |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| RICHARD HAMLETT | ) | Chief United States District Judge |

**MEMORANDUM OPINION AND ORDER**

Pending before the court is defendant Richard Hamlett's motion for a new trial (Mot. for New Trial, Dkt. No. 85) and supplement to his motion for a new trial (Suppl. Mot. for New Trial, Dkt. No. 92). The United States has responded to both motions (Dkt. No. 96), and Hamlett has not filed a reply. For the reasons discussed below, the court will deny Hamlett's motion.

## I. BACKGROUND

On February 22, 2024, a federal grand jury returned a four-count indictment charging Hamlett with bankruptcy fraud, in violation of 18 U.S.C. § 157(1) (Count One), making a false bankruptcy declaration, in violation of 18 U.S.C. § 152(3) (Count Two), perjury, in violation of 18 U.S.C. § 1623(a) (Count Three), and making a false statement, in violation of 18 U.S.C. § 1001(a)(2) (Count Four). These charges stem from allegations that Hamlett entered the United States Bankruptcy Court for the Western District of Virginia and prepared a bankruptcy petition for a company called Northview Corporation in an attempt to stop the foreclosure of one of his properties. At the time, it is alleged that Hamlett believed the Bankruptcy Court had enjoined him from filing further bankruptcy petitions due to previous filings being dismissed and an order prohibiting one of his companies from filing for bankruptcy for one year.

The indictment alleges that Hamlett fraudulently signed the petition using the name of his neighbor, Randall Robertson, and falsely represented him as the "Vice President" of Northview.

Additionally, Hamlett is accused of pretending to be an individual named George Robertson, a fictitious nephew of Randall Robertson, to file the fraudulent bankruptcy petition for Northview with the clerk's office.

Following the filing, the Bankruptcy Court scheduled a hearing on the petition. Hamlett was called to testify under oath, during which it is alleged that he falsely denied bringing the bankruptcy petition to the clerk's office. When later interviewed by an FBI agent about these events, Hamlett again allegedly falsely denied that he was the person who filed the petition.

A trial was held on October 1–3, 2024, and the jury returned a verdict finding Hamlett not guilty as to Counts One and Two, but guilty as to Counts Three and Four. Facts relevant to Hamlett's motions will be discussed in context.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 33 allows a district court, "[u]pon the defendant's motion, [to] vacate any judgment and grant a new trial if the interest of justice so requires." The standard for granting a new trial depends, in part, on the grounds advanced by the moving party, but a district court "should exercise its discretion to grant a new trial sparingly . . . ." *United States v. Chong Lam*, 677 F.3d 190, 203 (4th Cir. 2012) (internal citations and alterations omitted). The overriding factor is that the "interest of justice" must require it.

A new trial may be granted because evidence was improperly admitted or excluded, if that likely influenced the verdict. *Cf. United States v. Burfoot*, 899 F.3d 326, 340 (4th Cir. 2018) (denying motion for new trial premised on various grounds, including inadmissible testimony); *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003). In ruling on a Rule 33 motion, moreover, the court does not view the evidence in the light most favorable to the government. *United States v. Miller*, 41 F.4th 302, 315–16 (4th Cir. 2022). The court may consider the

2

strength of the evidence, and "it may evaluate the credibility of the witnesses." *United States v. Arrington*, 757 F.2d 1484, 1485 (4th Cir. 1985).  In particular, a court may grant a new trial where the evidence of guilt was arguable or marginal and an adverse verdict thus likely was influenced by errors made at trial.  *See, e.g.*, *United States v. Russell*, 221 F.3d 615, 621 (4th Cir. 2000).

## III.  DISCUSSION

In his motion, Hamlett argues that four alleged errors by the court require a new trial. First, he claims that the court erred in excluding from evidence the Virginia DMV record of a person named George Robertson.  Second, he argues that the court improperly limited cross-examination of Special Agent Miller regarding misidentification.  Third, Hamlett contends that evidence of witness Randall Robertson's ("Mr. Robertson") bi-polar diagnosis and symptoms should have been admissible.  Finally, he argues that the jury was improperly sequestered and influenced.  Each argument is discussed in turn.

### A.  George Robertson's DMV Record

Hamlett argues that the DMV record of an individual named "George Robertson," who lived in Roanoke and was the same age as Hamlett, was admissible.  He contends the court erred when it precluded Hamlett from offering the DMV record into evidence.  During trial, Hamlett attempted to introduce the evidence through Special Agent Miller, but the government objected on grounds that the evidence (1) was not properly authenticated, and (2) constituted inadmissible hearsay.  The court sustained the objection but permitted limited questioning to impeach Special Agent Miller.

#### 1.  The DMV record was not properly authenticated.

"To satisfy the requirement of authenticating or identifying an item of evidence, the

proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). As relevant here, Rule 901(b) includes a non-exhaustive list of examples of ways to authenticate a document, including "Testimony of a Witness with Knowledge," to the effect "that an item is what it is claimed to be." Fed. R. Evid. 901(b)(1). Some records are self-authenticating, that is "they require no extrinsic evidence of authority in order to be admitted." Fed. R. Evid. 902.

During cross-examination of Special Agent Miller, a Government witness, the defendant sought to introduce a Virginia DMV record of a man named George Robertson, "who is the same age as Mr. Hamlett, and who has the same build and similar looks [as] Mr. Hamlett." (Mot. for New Trial 6.) Hamlett contends that "Special Agent Miller was a witness with knowledge" as he "directed that Mr. George Robertson's driving record be pulled from the DMV database," and therefore, Special Agent Miller was able to authenticate it under Fed. R. Evid. 901(b). (*Id.* at 9.) However, as defense counsel acknowledged during trial, Special Agent Miller is not associated with the Virginia DMV and did not pull the record himself. (Day Two Trial Tr. 156:8–13, Dkt. No. 90.) Special Agent Miller directed another FBI employee, located in a different FBI office, to search a database for an individual named "George Robertson" from Roanoke, Virginia. Although this search resulted in that employee sending what looked like a DMV record to Special Agent Miller, and the government subsequently providing that record to Hamlett, it remains Hamlett's responsibility to authenticate the record should he wish to enter it into evidence. *See* Fed. R. Evid. 901(a). No one from the DMV certified the record or testified. The court was not provided with any information to establish that the individual in the record was in fact an individual named George Robertson, that he resided in Roanoke, Virginia, that he was the

nephew of Hamlett's neighbor, Randall Robertson,[1] or even that he was alive at the time of the

incident.  (*See* Day Two Trial Tr. 153:21–162:9.)  Special Agent Miller did not have personal

knowledge of this information; therefore, he was not able to authenticate the record.  As such,

the court rightfully excluded the DMV record from the evidence.[2]

## 2.  The DMV record was inadmissible hearsay.

Hearsay refers to any statement made outside of the courtroom by a declarant that "a

party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid.

801(c).  Hearsay is inadmissible except as otherwise provided by federal rule or statute.  Fed. R.

Evid. 802.  One such exception is for public records, provided in Rule 803(8), which allows for

the admission of certain records or statements of a public office.  Fed. R. Evid. 803(8).  Public

records are self-authenticating—meaning they do not require additional extrinsic evidence of

authenticity in order to be admitted—if they are signed and certified in accordance with Rule

902(2).

Hamlett first argues that the DMV record is machine-generated raw data that does not

constitute hearsay.  (Mot. for New Trial 8–9.)  The Fourth Circuit has noted that raw data

---

[1]  There also was no indication that the individual in the record had any known connection to Hamlett, Randall Robertson, or anyone associated with Hamlett's business.

[2]  Hamlett also argues that his due process rights were violated by the exclusion of this evidence.  He cites *Crane v. Kentucky*, 476 U.S. 683, 690  (1986), which emphasizes that the Constitution guarantees criminal defendants "a meaningful opportunity to present a complete defense."  Additionally, Hamlett references the Fourth Circuit's decision in *United States v. Abbas*, 74 F.3d 506, 510 (4th Cir. 1996), which states that the Constitution "provides that a criminal defendant has a right to present his best defense."  However, as the Supreme Court has acknowledged, "[a] defendant's right to present relevant evidence is not unlimited, but rather is subject to reasonable restrictions.  A defendant's interest in presenting such evidence may thus bow to accommodate other legitimate interests in the criminal trial process. . . . State and federal governments unquestionably have a legitimate interest in ensuring that reliable evidence is presented to the trier of fact in a criminal trial.  Indeed, the exclusion of unreliable evidence is a principal objective of many evidentiary rules."  *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (cleaned up).  In this case, without proper authentication of the DMV record, the court cannot ensure the reliability of this evidence.  As such, its exclusion is proper and does not violate Hamlett's constitutional rights.

5

generated by machines is not considered hearsay because such data does "not constitute 'statements,' and the machines are not 'declarants.'" *United States v. Washington*, 498 F.3d 225, 231 (4th Cir. 2007). However, this reasoning does not apply to a DMV record, which is created from information entered by humans into a computer, with the record reflecting that information. A "statement" is defined as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a). A "declarant" is the person who makes a statement. Fed. R. Evid. 801(b). In the case of a DMV record, the declarant is the individual who provided the information for the record, and the statement is the written assertion made by the declarant as reflected in the record. Therefore, the DMV record constitutes hearsay and is inadmissible unless an exception is provided by federal rule or statute.[3]

Hamlett also argues that even if the DMV record is not considered machine-generated data, it should still be admissible under the public records exception to the hearsay rule under Rule 803(8). (Mot. for New Trial 9.) While he acknowledges that public records need to be certified pursuant to Rule 902(2) to be self-authenticated, Hamlett contends that he should not be punished for failing to obtain a certification of the record because it was "manifestly impossible for the Defense to get a certification from the DMV" given that the government provided the record to him just the evening before trial.[4] (*Id.* at 10.) However, the court is unaware of any case law, nor did Hamlett cite any in his motion, suggesting that the requirements of Rule 902(2) be waived simply because the defense was made aware of the record shortly before trial.

---

[3] Even if the DMV record was considered machine-generated raw data, it would still have to be authenticated. "Any concerns about the reliability of such machine-generated information is addressed through the process of authentication not by hearsay or Confrontation Clause analysis." *Washington*, 498 F.3d at 231. As discussed above (*see supra* Section III.A.1.), Hamlett failed to authenticate this record. Therefore, even if the record were not considered hearsay, it would still be inadmissible.

[4] The court notes that Hamlett's argument—claiming that time constraints made it "manifestly impossible" to obtain a certification before trial—was not raised during trial. Instead, Hamlett introduces this argument for the first time in his motion for a new trial.

Furthermore, Hamlett did not request additional time to obtain the certification, nor, to the

court's knowledge, did he take steps to secure a witness to properly authenticate the record under

Rule 803(8).

This brings the analysis back to the issue of authenticating the record through Special

Agent Miller.  Since the DMV record was not certified pursuant to Rule 902(2), Hamlett needed

to lay the foundation to establish that the evidence met the public records exception to hearsay

under Rule 803(8).  Hamlett failed to do so.  (*See supra* Section III.A.1.)  Therefore, even under

Hamlett's alternative theory of admissibility through the public records exception, the court

correctly excluded the DMV record from evidence.

### 3.  The court properly allowed Hamlett to use the DMV record for impeachment.

Hamlett argues that "[a]lthough Defense Counsel was allowed severely limited

questioning to impeach Special Agent Miller's investigation based on this George Robertson, the

impeachment was incomplete given the Defense Counsel was prohibited from asking questions

that quoted the DMV record."  (Suppl. Mot. for New Trial 2.)  As discussed above, the DMV

record was not authenticated and was inadmissible hearsay.  Therefore, questioning Special

Agent Miller about the contents of that record for impeachment purposes would have been

improper.  However, as the government acknowledged, Hamlett was permitted to—and did—use

the DMV record to impeach Special Agent Miller regarding the existence of a driver's license

belonging to a George Robertson residing in Roanoke, Virginia.  (Day Two Trial Tr.

158:20–162:9.)  The court gave the following limiting instruction regarding Special Agent

Miller's testimony regarding the DMV Record: "This evidence is being admitted not for its truth.

It has a limited purpose to the extent it would impeach the witness.  It is not offered for its truth,

however."  (*Id.* at 160:9–13.)  The court finds that it properly limited the use of the DMV record

for impeachment purposes. Therefore, the court finds no basis to conclude that the exclusion of

the DMV record as evidence, or its limited use for impeachment purposes, justifies granting a

new trial in the interest of justice.

## B. Cross-examination of Special Agent Miller

Hamlett argues that he "was limited during cross-examination in questioning Special

Agent Miller on his knowledge of misidentification and his tactics or lack thereof to avoid such

misidentification." (Mot. for New Trial 11.) Specifically, Hamlett wanted to question Special

Agent Miller on the importance of using six-pack photo arrays for suspect identification

procedures and the risks of misidentification when those procedures are not followed.[5] (*See* Day

Two Trial Tr. 168:14–173:21.) In this case, Special Agent Miller showed a witness a single

photo of Hamlett to determine if the witness recognized him as the person who filed the

bankruptcy petition in the clerk's office on the day of the incident. (Suppl. Mot. for New Trial

3–4.) However, the witness was unable to identify the man in the photo (Hamlett) as the person

he had encountered at the clerk's office that day. (*Id.*) Hamlett sought to ask Special Agent

Miller why he did not use a six-pack photo array in this investigation. (*Id.* at 4.) Hamlett argues

that this line of questioning would have impeached Special Agent Miller's credibility, "created

reasonable doubt," and exposed bias in Special Agent Miller's investigation. (*Id.*)

The court sustained the government's objection to the questioning about the six-pack

photo array because Special Agent Miller did not use this method in his investigation.

Furthermore, the witness who was shown the single photo of Hamlett could not identify him as

the man who had been in the clerk's office. While single-photo identification investigative

---

[5] Special Agent Miller described a six-pack photo array as, "an array of consistent photographs of an individual that you're trying to identify. So generally, we call it a six-pack where you would have six photos all generally resembling the person you're trying to identify, or have a witness identify, one of which is the suspect." (Day Two Trial Tr. 168:19–23.)

procedures may be impermissibly suggestive, *see United States v. Murdock*, 928 F.2d 293, 297 (8th Cir. 1991) ("single photograph arrays are considered impermissibly suggestive"), this concern is moot in this case because the witness did not identify Hamlett as the person he encountered at the clerk's office.  Therefore, no evidence was presented to suggest that a six-pack photo array was relevant to the investigation.  The court did allow questioning about the photo shown to the witness, and that photo was admitted into evidence.  (*See* Def. Ex. 17, Dkt. No. 78-27.)  Ultimately, no identification was made from that photo.  Given these circumstances, the court finds that limiting cross-examination to exclude questions about the six-pack photo array investigative technique was appropriate.

Even if the court had erred by excluding this line of questioning about Special Agent Miller's investigative techniques, such error would not warrant a new trial.  Two other witnesses identified Hamlett as the man they saw in the clerk's office without any photo array, based on prior encounters with him.  The only witness shown a photograph for suspect identification could not identify the man in the photo as the person he had seen at the clerk's office.  As such, photo arrays for suspect identification played a minimal role—if any—in the investigation of Hamlett.  Therefore, the court finds no justification for granting a new trial based on the limitation of cross-examination of Special Agent Miller regarding the use of six-pack photo arrays.

## C.  Randall Robertson's Medical Condition

Hamlett argues that Mr. Robertson's 2004 habeas petition, which mentions his bipolar disorder diagnosis and symptoms, should have been admissible for impeachment purposes and as substantive evidence.[6]  (Mot. for New Trial 12.)

---

[6]  No evidence was provided to support a diagnosis of bipolar disorder.  In his habeas petition, Robertson claimed to have bipolar disorder, yet failed to provide any medical or professional documentation to validate this assertion.

### 1. Background

During cross-examination of Mr. Robertson, defense counsel asked him if he had ever

been diagnosed with bipolar disorder.

> DEFENSE COUNSEL:  Mr. Robertson, are you currently diagnosed with bipolar disorder?
>
> RANDALL ROBERTSON:  Not currently, no.
>
> DEFENSE COUNSEL:  Were you diagnosed with bipolar disorder back in 2023?
>
> RANDALL ROBERTSON:  No.
>
> DEFENSE COUNSEL:  So you currently do not have bipolar disorder.
>
> RANDALL ROBERTSON:  As far as I know—I'm no expert by any means—I've never had bipolar effective disorder.
>
> DEFENSE COUNSEL:  Okay. As far as you know, you've never had bipolar disorder.
>
> RANDALL ROBERTSON:  No.

(Day Two Trial Tr. 98:3–13.)  Defense counsel then sought to impeach Mr. Robertson using a

habeas petition he filed in 2004 in relation to a previous criminal conviction.

> DEFENSE COUNSEL:  And as part of that conviction you filed a habeas petition; isn't that right?
>
> RANDALL ROBERTSON:  I did.
>
> DEFENSE COUNSEL:  And you wrote that petition?
>
> RANDALL ROBERTSON:  No, I had a friend write it for me.
>
> DEFENSE COUNSEL:  You reviewed it before it was --
>
> RANDALL ROBERTSON:  I reviewed it, yes, ma'am, before it was turned in.
>
> DEFENSE COUNSEL:  Because you wanted to make sure everything in it was accurate, right?
>
> RANDALL ROBERTSON:  Pretty much, yes.

> DEFENSE COUNSEL:  You don't want to lie to the Court.
>
> RANDALL ROBERTSON:  No, no, I don't want to lie to the Court at all.
>
> DEFENSE COUNSEL:  And you would recognize that petition if you saw it today in court, correct?
>
> RANDALL ROBERTSON:  Yes.

(Day Two Trial Tr. 98:16–99:4.)  In relevant part, the habeas petition criticizes Mr. Robertson's lawyer for failing to pursue Mr. Robertson's "medical and mental limitations."  (Habeas Petition 15, Dkt. No. 85-2.)  The petition asserts that his lawyer "failed to reveal any of the petitioner's mental condition, Bi-polar disorder and AADD, which causes joking, manic moods and dramatizing to bring him out of depression."  (*Id.*)  The petition further alleges that Mr. Robertson's "physician [], was never contacted by the petitioner's lawyer [] before the trial or during the trial, thus not allowing the jury to know the petitioner's mental state."  (*Id.*)

Defense counsel attempted to impeach Mr. Robertson by using the habeas petition, but the government objected, and the court observed that defense counsel had not yet established that Mr. Robertson had reviewed the entirety of the petition.  (Day Two Trial Tr. 99:6–100:3.)  During the sidebar, the government further argued that the habeas petition was extrinsic evidence, which could not be used for impeachment.  The government emphasized that defense counsel was "stuck with the answer" Mr. Robertson gave, pursuant to Fed. R. Evid. 608.  (*Id.* at 100:5–11.)  Defense counsel disagreed, asserting that Mr. Robertson's own statements could be used as extrinsic evidence.  (*Id.* at 100:12–15.)  The court noted that Mr. Robertson's testimony, up to that point, had indicated that he reviewed the habeas petition, not "that he stands by everything in it."  (*Id.* at 100:16–17.)  The court expressed concern about this old statement that did not concern these events.  Defense counsel then tried to refresh Mr. Robertson's memory.

> DEFENSE COUNSEL:  Would it refresh your memory if you signed it if you saw a page -- if you saw your habeas petition?

RANDALL ROBERTSON:  It's -- well, it was almost 20 years ago.  I'm sure there
will be some recollection.

DEFENSE COUNSEL:  Okay. So if you reviewed it -- if you saw your signature on a
petition, that would jog your memory, correct?

RANDALL ROBERTSON: It would jog my memory that I signed it, yes.

(*Id.* at 101:17–23.)  The government objected on the grounds that defense counsel had not

established that reviewing the relevant portion of the petition would help refresh Mr. Robertson's

recollection regarding the issue at hand.  (*Id.* at 101:13–102:1.)  The court sustained the objection

(*Id.* at 102:1), and defense counsel moved on to a different line of questioning.

### 2.  Using the habeas petition for impeachment

"Prior inconsistent statements may be used to impeach the credibility of a witness; as a

preliminary matter, however, the court must be persuaded that the statements are indeed

inconsistent." *United States v. Hale*, 422 U.S. 171, 176 (1975).  Rule 613(a) allows the

impeaching attorney to confront a witness with a prior statement without disclosing its contents

to the witness, but "the party must, on request, show it or disclose is contents to an adverse

party's attorney." Fed. R. Evid. 613(a).  "A prior statement is inconsistent if it, taken as a whole,

either by what it says or by what it omits to say affords some indication that the fact was

different from the testimony of the witness whom it sought to contradict." *United States v.

Barile*, 286 F.3d 749, 755 (4th Cir. 2002) (cleaned up) (internal citations omitted).

In this case, Mr. Robertson testified, "As far as I know . . . I've never had bipolar

disorder."  (Day Two Trial Tr. 98:9–10.)  Defense counsel then confirmed with Mr. Robertson

that he had filed a habeas petition related to his prior criminal conviction, to which he agreed he

had signed it "as far as [he] remember[s]."  (*Id.* at 101:2–8.)  Defense counsel attempted to

refresh Mr. Robertson's  memory by showing him the petition with his signature on it, but the

government objected, and the court sustained the objection.  (*Id.* at 101:17–102:1.)  Although

defense counsel informed the court that the habeas petition contained Mr. Robertson's signature, counsel did not reveal other key details of the document that would have led the court to conclude the petition was fully adopted by Mr. Robertson, even though he testified that a friend had written it on his behalf and that he had only reviewed it.  The court now knows that the habeas petition was signed in two places: once with a declaration under penalty of perjury, affirming that the contents were true and correct, and again in a section where Mr. Robertson swore that the facts stated in the petition were true to the best of his information and belief.  (*See* Habeas Petition 6, 21.)  The statement contained in the petition—"The petitioner's lawyer [] failed to reveal any of the petitioner's mental condition, Bi-polar Disorder and AADD, which causes joking, manic moods and dramatizing to bring him out of depression"—clearly "affords some indication that the fact was different" from Mr. Robertson's testimony at trial.  (*Id.* at 15.) Upon review, the court acknowledges that it may have erred in not allowing defense counsel to question Mr. Robertson about the prior inconsistent statement in his 2004 habeas petition.

However, any error in excluding the habeas petition as impeachment evidence was harmless.  Mr. Robertson's credibility had already been significantly challenged.  On direct examination, Mr. Robertson testified that he retired from the Virginia Department of Corrections in 2002 due to an "injury sustained from an accident."  (*Id.* at 54:13–20.)  During cross-examination, defense counsel impeached him on this testimony, revealing that Mr. Robertson had actually been terminated after being criminally convicted for possession with intent to distribute narcotics, a crime he committed while working at the Virginia Department of Corrections.  (Day Two Trial Tr. 89:24–90:21.)  In determining whether a violation of the right to cross-examine is a reversable error, "[t]he central question is whether the jury would have received a significantly different impression of the witness's credibility had defense counsel been

permitted to pursue his proposed line of cross-examination." *United States v. George*, 532 F.3d 933, 936 (D.C. Cir. 2008) (citation and quotations omitted); *accord Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). Impeaching Mr. Robertson on his habeas petition—supposedly written by someone else over 20 years ago and unsupported by corroborating medical records— would not have altered the jury's perception of his credibility. This is particularly true given that defense counsel had already impeached Mr. Robertson with his prior criminal conviction, which cast significant doubt on his trustworthiness. Therefore, the court finds no justification for granting a new trial based on the limitation of cross-examination regarding Mr. Robertson's habeas petition, which mentions his bipolar disorder and symptoms.

### 3. Using the habeas petition as substantive evidence

Rule 613(b) governs the admissibility of extrinsic evidence of prior inconsistent statements made by a witness. Specifically, it provides that "[u]nless the court orders otherwise, extrinsic evidence of a witness's prior inconsistent statement may not be admitted until after the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it." Fed. R. Evid. 613(b). However, "even if all the foundational elements of Rule 613 are met, a district court is not unequivocally bound to admit any or all extrinsic evidence of a prior inconsistent statement." *United States v. Barile*, 286 F.3d 749, 756 (4th Cir. 2002). Rather, the court retains its discretion under Rule 403 "to exclude such evidence when its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." *Id.* Additionally, the Fourth Circuit has cautioned the courts on allowing a witness to be cross-examined about his or her mental health.

> One's psychiatric history is an area of great personal privacy which can only be invaded in cross-examination when required in the

14

interests of justice. This is so because cross-examination of an adverse witness on matters of such personal privacy, if of minimal probative value, is manifestly unfair and unnecessarily demeaning of the witness. Moreover, such cross-examination will generally introduce into the case a collateral issue, leading to a large amount of testimony substantially extraneous to the essential facts and issues of the controversy being tried. Because of the obvious unfairness of such a cross-examination and its needless waste of judicial time, it has been posited in an authoritative text that, 'Courts should have the power to protect witnesses against cross-examination that does little to impair credibility but that may damage their reputation, invade their privacy, and assault their personality.' And Rule 403, Federal Rules of Evidence provides the courts with the power to do just this.

*United States v. Lopez*, 611 F.2d 44, 45 (4th Cir. 1979) (citations omitted).

Even assuming that defense counsel could establish the proper foundation to introduce Mr. Robertson's habeas petition as extrinsic evidence under Rule 613(b), its admissibility would still not be warranted.  The  probative value of the habeas petition is substantially outweighed by several potential risks outlined in Rule 403.  Hamlett argues that Mr. Robertson's alleged bipolar disorder is directly relevant to the defense's theory, suggesting that Mr. Robertson—or possibly his nephew, George Robertson—might have exhibited the "odd" or "bizarre" behavior observed in the bankruptcy clerk's office that could align with symptoms of bipolar disorder.  (Mot. for New Trial 13.)  However, this habeas petition raises more questions than it answers.  Notably, there is no corroborating medical evidence to support the claim that Mr. Robertson was actually diagnosed with bipolar disorder.  Introducing the habeas petition as substantive evidence would divert the jury's attention to a collateral issue, unrelated to the essential facts of the case, as the Fourth Circuit cautioned against in *Lopez*.

Furthermore, there is no evidence to suggest that Mr. Robertson suffered from bipolar disorder at the time of the events in 2023, when the bankruptcy petition was filed.  For cross-examination about a witness's impairment to be valid, the impairment must be closely linked to

the time period relevant to the witness's testimony. *See Lopez*, 611 F.2d at 46. In this case, the habeas petition was filed in 2004—nearly 20 years before the events Mr. Robertson was testifying about. Moreover, the statement in the habeas petition claiming Mr. Robertson's bipolar disorder is unsupported by any medical evidence. It asserts that "[t]he petitioner's lawyer [] failed to reveal any of the petitioner's mental condition, Bi-polar Disorder and AADD, which causes joking, manic moods and dramatizing to bring him out of depression." (Habeas Petition 15.) This assertion has minimal probative value, and any potential value is substantially outweighed by the many risks associated with introducing this collateral issue, including the risks of confusing the jury and wasting time.

Given these concerns, the court finds no basis for admitting Mr. Robertson's habeas petition as substantive evidence. Therefore, it sees no justification for granting a new trial based on this exclusion. The potential for unfair prejudice, confusion, and distraction from the central issues of the case would outweigh any limited probative value the habeas petition might offer.

## D. Jury Deliberations

Hamlett argues that the jury was improperly sequestered and influenced, thereby violating his Sixth Amendment right to an impartial jury. (Mot. for New Trial 14–19.)

### 1. Background

On day three of the trial, the jury was given instructions by the court and began deliberations sometime around 9:30 a.m. (Day Three Trial Tr. 41:14–18, Dkt. No. 91.) Shortly before 1:41 p.m. the court received a note from the jury, whereafter the judge reconvened the parties.

> THE COURT: Good afternoon, everyone. I've received a note from the jury, and the note says: "We are at an impasse. Directions?" So I intend to call the jury in and give them an Allen charge. Any objection, [from the government]?
>
> THE GOVERNMENT: Not from the government, Your Honor.

THE COURT:  [Defense Counsel]?

DEFENSE COUNSEL:  Yes, Your Honor.  We would object to an Allen charge.  This case is one that is based on identification and credibility.  It's not a particularly difficult case or technical case, and they have been at this for four hours now.  I don't think any more time will suffice, Your Honor.

THE COURT:  Well, there's no way for me to guess that, so I'm going to give an Allen charge.  I understand if I have given one and then they come back again and say they can't make a decision, but I will give the Allen charge.  But your objection is noted for the record.

DEFENSE COUNSEL:  Thank you, Your Honor.

THE COURT:  Thank you.  If you would bring our jurors in.

(*Id.* at 41:19–42:14.)  The court then proceeded to give an *Allen* charge to the jury, after which a

juror asked a question to the court.

THE JURUR:  May we have a quick break to use our phones to call family if need be to let them know it will take a while longer?

THE COURT:  That is perfectly fine, but just remember if you do so you cannot -- anyone who stays back in the room cannot deliberate further or talk about the case.  And you are not to discuss the case with anyone while you do that or not -- don't discuss the case with anyone, don't research.  You know the admonitions.  Where are your phones?

THE JUROR:  Across the parking lot.  Just to make plans for children.

THE COURT:  Counsel, any objection to that?

THE GOVERNMENT:  Not from the government, Your Honor.

DEFENSE COUNSEL:  No, Your Honor.

THE COURT:  Very well.  So I'm going to go ahead and allow you to do that.  But then I would ask you to go back and continue to deliberate.  All right.  At this time I'll -- we'll recess until return of the jury.

(*Id.* at 44:10–45:3.)  The jury was released to continue deliberations and the court recessed at

1:47 p.m.

Sometime around 2:23 p.m. the court was notified that a juror wanted to take a break

17

from deliberations to go and pick up a child from school.[7]  (*Id.* at 45:11–14.)  When the court

instructed the court security officer to bring all the jurors back in, the officer informed the court

that three were missing from the jury room.  (*Id.* at 46:9–47:15.)  Eventually, all of the jurors

were rounded up and returned to the jury box.

> THE COURT:  All right.  We have all 12 jurors back in the jury box.  First I'll ask -- I
> don't know who the foreperson is, but I'll ask the foreperson if you have been able to
> deliberate at all since my last instruction.
>
> THE JURY FOREPERSON:  Yes, Your Honor, we have.
>
> THE COURT:  All right, thank you.  You may be seated.

(*Id.* at 47:16–23.)  The court then had a dialogue with the juror who was requesting permission to

pick up his six-year-old child from school because he could not make arrangements for anyone

else to do so.  (*Id.* at 48:10–50:16.)  He estimated that it would take 30 to 45 minutes for him to

pick up his child, drop her off in someone else's care, and return to the courthouse.  The court

responded.

> THE COURT:  All right.  Well, that's not usually how this works. I expect everyone to
> make arrangements.  And there would be always a possibility that I could call in our
> alternate, but it would take our alternate longer than that to come and get to the
> courthouse, and then you would have to start redeliberating the whole case.  So I don't
> think that would be a good use of our time.  So -- so I will excuse you to go get your
> child and come back to this courthouse as quickly as you can, and I tell all the other
> jurors that you cannot deliberate with regard to this case while the juror is gone.  All
> right.  So -- yes, ma'am.
>
> THE JUROR:  While we're taking this break, can I go to my car?
>
> THE COURT:  Yes.
>
> THE JUROR:  Okay.
>
> THE COURT:  But no one can -- other than him can leave, all right?  You can go to your
> car, but you cannot leave.  You can leave the building briefly, but you cannot get in your

---

[7]  Initially, the court thought that one juror wished to leave to pick up a child, while another simply wanted to leave.  However, it was later clarified that it was just one juror who had requested permission to leave in order to pick up his six-year-old daughter from school, because he was unable to make arrangements for someone else to pick her up.  (*See* Day Three Trial Tr. 45:12–51:17.)

car and go somewhere, all right?

THE JUROR:  Okay.

THE COURT:  All right.  You may return to the jury room, and you are excused to go get your child.  All right.  And you may return then, ladies and gentlemen, to the jury room.

(*Id.* at 50:17–51:17.)  On their way back to the jury room, one juror stopped and asked the court, "Is there a timeframe of how long w have to make a decision, or could it go into another day if it was necessary?"  (*Id.* at 51:20–22.)  The court attempted to gather all of the jurors back address the question collectively, but some had already stepped out of the jury room for a break.  As a result, the court informed the juror that it would provide a written response so that all jurors could see it.[8]  Once the jurors were out of the courtroom, defense counsel motioned for a mistrial for several reasons.  The court denied the motion.  (*Id.* at 52:10–56:10.)  Shortly thereafter, the court recessed at 3:00 p.m. and reconvened at 4:54 p.m. when the jury notified the court that they had reached a verdict.  (*Id.* at 58:12–14.)

## 2.  The jury was not improperly sequestered or influenced.

The Sixth Amendment guarantees that "the accused shall enjoy the right to a . . . trial, by an impartial jury."  U.S. Const. amend VI.  "The right to trial by an impartial jury 'guarantees . . . a fair trial by a panel of impartial, indifferent jurors.'"  *Robinson v. Polk*, 438 F.3d 350, 359 (4th Cir. 2006) (citing *Irvin v. Dowd*, 366 U.S. 717 (1961)).  This right prohibits "any private communication, contact, or tampering, directly or indirectly, with a juror during trial about the matter pending before the jury."  *Remmer v. United States*, 347 U.S. 227, 229 (1954).  The

---

[8]  The court provided the following written response to the jury:  "As you were exiting the courtroom, one juror returned with a question.  She asked how long the jury is required to deliberate.  I am providing a response in writing so that the entire jury will have my response.  There is no time limit on deliberations.  As I informed you in my last instruction, if you find yourself in the minority, please listen and carefully consider the views of the majority.  If you find yourself in the majority, please listen and carefully consider the views of the minority.  If you are doing so and your deliberations are productive, please continue.  If, after you have done so, you are no longer productive and are still at an impasse, you may so inform the court."  (Dkt. No. 80.)

Fourth Circuit has emphasized that "if even a single juror's impartiality is compromised by an improper extraneous influence, the accused has been deprived of the right to an impartial jury." *Fullwood v. Lee*, 290 F.3d 663, 667 (4th Cir. 2002) (internal citation omitted).

When a jury reaches an impasse, a supplemental instruction may be given to encourage jurors to reach a consensus. This is commonly known as an "*Allen* charge." *Allen v. United States*, 164 U.S. 492 (1896). However, an *Allen* charge must not coerce the jury. It must be fair, neutral, and balanced. *United States v. Cornell*, 780 F.3d 616, 625 (4th Cir. 2015) (citing *United States v. Cropp*, 127 F.3d 354, 359–60 (4th Cir. 1997)). "In determining whether an *Allen* charge has an impermissibly coercive effect on jury deliberations, some of the factors [to] consider include the language of the instruction, its incorporation with other instructions, the timing of the instruction, and the length of the jury's subsequent deliberations." *Cornell*, 780 F.3d at 626 (internal citations omitted).

Hamlett argues that the jury was improperly sequestered and influenced, thereby violating his Sixth Amendment right to an impartial jury. (Mot. for New Trial 14–19.) He contends that the jury deliberations were neither private nor secret and raises several concerns which are addressed below.

First, Hamlett takes issue with the jury deliberations that took place between when they were excused after the *Allen* charge, around 1:47 p.m., and when they returned to the courtroom around 2:40 p.m.[9] He claims it is "highly improbable that the jurors were able to deliberate as a group in the 39 minutes between questions when at least [three] jurors were missing before the judge could reconvene the court." (*Id.*) However, the court explicitly asked the jury upon their return if they had time to deliberate after the *Allen* charge, and the jury foreperson said that they

---

[9]  The court reconvened at 2:23 p.m. but it took some time for the court security officers to locate the three jurors who stepped outside the jury room for a break. (*See* Day Three Trial Tr. at 46:9–47:15.)

had.  While three jurors were late when the court reconvened, there is no evidence to suggest

they were on break the entire "39 minutes."  In fact, it is perfectly logical to conclude that

deliberations began immediately after the jurors were excused following the *Allen* charge.

Whether that was for one minute or 38 minutes does not suggest they violated the courts rules by

deliberating without all jurors present in the jury room.

Hamlett also calls attention to the period of time when one juror was excused to pick up

his child from school.  He claims that "at least for 45 minutes (and potentially longer) the jurors

were wandering the same courthouse where the defendant was located, and it is unclear when

they all reconvened for group deliberations."  (*Id.*)  This does not suggest that the jurors were

deliberating in secret.  Rather, it suggests that they were following the court's instruction to only

discuss the case in the jury room with fellow jurors during deliberations.  The jurors were

allowed a break, and Hamlett's assertion that the jurors in the hallways amounts to "a lack of

privacy and secrecy of deliberations" is speculation and unsupported.

Furthermore, Hamlett emphasizes that one juror appeared "visibly frustrated" and that the

other jurors "observ[ed] the tense exchange between the judge and the juror."  (Mot. for New

Trial 17.)  However, the court's observation of the interaction during trial differed from this

characterization of the exchange.  (*See* Day Three Trial Tr. 53:19–21.)  After reviewing the

transcript, the court finds no indication of anything beyond a concerned juror, understandably

worried about his six-year-old daughter being left stranded at school.  The court alleviated this

concern by excusing the juror to pick up his child before returning to deliberations, which was

the proper decision.  *See United States v. Almonte*, 594 F.2d 261, 267 (1st Cir. 1979) ("After

questioning the foreman, the court examined its options and determined, quite properly we

believe, that it was better to allow the sequestered jurors to separate for the night than to compel

the foreman, who stated that he could not concentrate fully until he returned home and attended his wife's problems, to continue to deliberate.").

Lastly, Hamlett argues that he was prejudiced by the *Allen* charge and the subsequent note written by the court in response to a juror's question (*see supra* n. 8). (Mot. for New Trial 18–19.) He contends that "the laissez-faire behavior of the jury and attitude towards deliberations . . . shows they were not deliberating to reach a true verdict but were merely trying to end the trial." (*Id.* at 18.) The court disagrees. First, only one formal *Allen* charge was given after the jury had deliberated for over four hours. Thereafter, the court provided a written response to a question from a juror asked while she was heading back to the jury room. This note reiterated some aspects of the *Allen* charge given, but did not constitute a second formal *Allen* charge. Even if it were considered a second *Allen* charge, the Fourth Circuit has held that a second charge does not automatically suggest unfair prejudice. *See Cornell*, 780 F.3d at 626 ("Our circuit has never adopted a flat ban on multiple Allen charges and we decline to do so now. . . . The district court is often in the best position to gauge whether a jury is deadlocked or able to proceed further with its deliberations.").

Second, the length of deliberations support the conclusion that the jury took its role seriously. Not only did they deliberate for over four hours before the *Allen* charge, but nearly two additional hours passed from when the jury was excused—during which time one juror picked up his child—until the jury informed the court they had reached a verdict just before 4:52 p.m. Even assuming it took the juror 45 minutes to pick up his daughter, drop her off, and return to the courthouse, the jury still would have deliberated for over an hour. Moreover, this case involved four separate counts, and the jury instructions were long. (*See* Jury Instructions, Dkt. No. 81.) Although the trial itself lasted less than three days, five to six hours of deliberation is a

reasonable amount of time for a jury to reach a verdict.  Notably, the jury returned a split verdict, which suggests a thoughtful and deliberate decision-making process.  *See Cornell*, 780 F. 3d at 627 ("[V]ery tellingly in this case, the jury returned a split verdict. Defendants' claim of coercion is negated by the fact that the jury acquitted three co-defendants and found predicate acts in only five of the nine categories submitted for their consideration. These actions reflect a thoughtful and deliberate jury — not one acting under an impulse of coercion.").

After reviewing its prior ruling, the court finds that it did not error in addressing the issues raised during jury deliberations.  Contrary to Hamlett's argument, he was not prejudiced by an impartial jury that was coerced into delivering a verdict, nor were his Sixth Amendment rights violated.  Therefore, the court finds no basis to conclude that the jury was improperly sequestered or influenced, and as such, there is no justification for granting Hamlett a new trial in the interest of justice.

## IV.  CONCLUSION AND ORDER

For the foregoing reasons, it is hereby ORDERED that Hamlett's motion for new trial (Dkt. No. 85) is DENIED.  The clerk is directed to provide a copy of this memorandum opinion and order to Mr. Hamlett and all counsel of record.

Entered: February 5, 2025.

*/s/ Elizabeth K. Dillon*
Elizabeth K. Dillon
Chief United States District Judge